Patrick Mause (AZ Bar No. 024269)
Law Office of Patrick Mause, PLLC
290 North Meyer
Tucson, Arizona 85701
Ph: 520.342.0000
Email: Patrick@PMauseLaw.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Dolan, and individual,<br><br>                    Plaintiff,<br>        vs.<br><br>Unum Life Insurance Company of America, a foreign corporation,<br><br>                    Defendant. | Case No.:<br><br>**COMPLAINT** |

For his Complaint against Defendant Unum Life Insurance Company of America, Plaintiff Shawn Dolan alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    At all times material to this Complaint, plaintiff Shawn Dolan was a resident and citizen of Pima County, Arizona.

2.    Plaintiff's claim is for long-term disability (LTD) benefits under his employer's ERISA-governed LTD benefit plan, and any other benefits he may be entitled to receive under his employer's ERISA-governed welfare benefits plan.

3.    Defendant Unum Life Insurance Company of America ("Unum") is a foreign corporation authorized to do business in  Pima County, Arizona and is doing business in Pima County, Arizona.

4.      The Court has jurisdiction over this matter pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*.

5.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391 because the "breach" of the LTD plan occurred in Pima County, Arizona, and because defendant Unum may be found in Pima County, Arizona.

### THE LONG-TERM DISABILITY PLAN

6.      Through his employment with Northrop Grumman Corporation ("Northrop"), Mr. Dolan was insured under a group LTD policy, Policy No. 586517 D02 (the "Policy").

7.      The Policy funded Northrop's ERISA-governed LTD plan (the "Plan").

8.      Under the Plan, and after satisfying the Plan's 6 month "elimination period" during which LTD benefits were not payable, Mr. Dolan was entitled to LTD benefits for up to two years as long as he was unable to perform the material and substantial duties of his regular occupation.

9.      After two years of LTD benefits, Mr. Dolan was entitled to LTD benefits if he was unable to perform the duties of "any gainful occupation" for which he was reasonably qualified based on his education, training, or experience.

### UNUM'S OBLIGATIONS UNDER ITS REGULATORY SETTLEMENT AGREEMENT

10.     Unum was previously investigated by numerous states' departments of insurance due to its improper claims practices.

11.     To resolve the allegations against the company, Unum entered into a Regulatory Settlement Agreement with 49 states, including Arizona. Unum also entered into a separate settlement agreement with California.

12.     Under the Regulatory Settlement Agreement (RSA), Unum must:

a. Giv[e] significant weight to an attending physician's ('AP') opinion, if the AP is properly licensed and the claimed medical condition falls within the AP's customary area of practice, unless the AP's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. In order for an AP's opinion to be rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.

13.    Under the RSA, Unum must also:

a. give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy.

14.    Under the RSA, Unum was also required to reasses tens of thousands of previously-closed claims and analyze whether the insureds were entitled to benefits. Unum found that 47% of those previously-closed claims were required to be reopened and benefits paid.

15.    In a 2006 earnings conference call with Unum's investors, then Senior VP, Finance, Corporate Development and Investment, Joe Zubretsky, was asked why Unum was approving so many claims that were being reassessed under the RSA. He responded:

a. "as we look at these claims, more and more of these claimants

3

than we anticipated in our original assumptions back in late '04 are already on Social Security… And pretty much, as you know, if you meet the definition of Social Security disability, by and large you had met the commercial definition."

16.    Unum's CEO Tom Watjen followed up to Mr. Zubretsky's statement asking EVP, Risk Operations Kevin McCarthy if he had anything to add, and Mr. McCarthy stated:

a. I think Joe got it right on the money. Social Security is the primary reason. Most of the overturns, or the large, large majority of the overturns are driven by the fact that the plaintiff had Social Security — were awarded Social Security after we made our original claim decisions in those years.

17.    A year ago, Unum CFO and former head of Unum's LTD and IDI blocks of business, John F. "Jack" McGarry was deposed in the case *Knuth v. The Paul Revere Life Ins. Co., et al.* Mr. McGarry testified the Unum's obligation under the RSA to give significant weight to SSDI awards remains and did not go away over time. He also testified that he knew Mr. Zubretsky and agreed with his statement that if an insured meets the Social Security definition of disability, they by and large meet the commercial definition under Unum's policies. (*Id*. at 92:9-23).

18.    Mr. McGarry also testified that Unum's obligation under the RSA to give significant weight to an attending physician's opinion remains and agreed "[n]othing has relieved the company of that responsibility with respect to reasonable claims handling".

19.    When asked in what circumstances an insured might receive SSDI benefits but not be eligible for Unum disability benefits, the examples he gave included for a pre-existing condition excluded under a Unum policy or if there

4

was an absence of coverage. Mr. McGarry further testified that if Unum denies a claim where the insured has received SSDI benefits, the information on which it is basing that rejection must be "compelling" and not "just some information."

### UNUM FINDS MR. DOLAN IS PERMANENTLY DISABLED, REQUIRES HIM TO APPLY FOR SOCIAL SECURITY DISABILITY INSURANCE (SSDI) BENEFITS, HIS SSDI CLAIM IS APPROVED, AND AFTER FIVE YEARS OF BENEFITS UNUM MANUFACTURES REASONS TO CLOSE

20.     Mr. Dolan began work for Northop in 1993.

21.     Over the next nearly twenty years, Mr. Dolan worked his way up to the position of Technical Services Project Manager 5, which is the job he held in early 2012 when he became disabled.

22.     Mr. Dolan's occupation involved sales, and required him to use a computer multiple hours every day.

23.     In early 2012, Mr. Dolan began experiencing symptoms like headache, dizziness, double vision, and what he initially believed to be passing out.

24.     In March 2012, Mr. Dolan was sitting at his computer reading when he passed out. Over the next several weeks, he experienced the same symptoms one to three times per week.

25.     At times, and while working on the computer, he would feel lightheaded, get hazy, and black out. He would awaken with a severe headache, dizziness, and ringing in his ears.

26.     While Mr. Dolan's physicians initially suspected he was suffering syncopal episodes (i.e. passing out), he was later diagnosed with "reflex epilepsy."

27.     Reflex epilepsy is a condition in which patients experience epileptic seizures in response to certain stimuli.

28.     The most well-known trigger for reflex epilepsy is rapidly blinking lights (a Japanese cartoon in 1997 was found to have triggered seizures in hundreds of children) but other triggers exist.

29.     In Mr. Dolan's case, it was ultimately determined that his reflex epilepsy was triggered by excessive reading or close concentration, though he also once experienced pre-seizure symptoms while driving at night through the blinking lights of a construction zone, forcing him to pull over and rest before proceeding.

30.     Because he was unable to work, Mr. Dolan applied for LTD benefits with Unum in March 2012.

31.     Unum reviewed Mr. Dolan's claim and found his claim was supported. Initially, Unum approved Mr. Dolan's claim under the Plan's "self-reported" condition provision. Under that provision, Mr. Dolan's benefits due to his disability for a "self-reported" condition would be limited to twenty-four months.

32.     Among the reasons for Unum's decision approving Mr. Dolan's claim were the findings of Unum's On-Site Physician or OSP, Dr. Todd J. Lyon. After reviewing Mr. Dolan's medical records an other information, OSP Dr. Lyon found: "The insured consistently reports frequent episodes of LOC [loss of consciousness] that are not medically explained at this time."

33.     Having approved Mr. Dolan's claim, albeit under the Plan's self-reported condition limitation, Unum examined whether Mr. Dolan may qualify for Social Security Disability Insurance (SSDI) benefits. Unum determined that Mr. Dolan may qualify for such benefits and referred him to Genex, a contractor who could assist Mr. Dolan with his SSDI claim.

34.     Under the Plan, if Mr. Dolan's SSDI claim were approved Unum would be entitled to reduce his monthly LTD benefit by the amount of his initial,

monthly SSDI benefit amount.

35.     In April 2013, Unum arranged to have a field representative interview Mr. Dolan to obtain additional information about his claim. Among other things, the field representative found: "At no time throughout the interview was any deceptive or suspicious behavior observed" and "The insured was forthcoming with all questions asked."

36.     After receiving the field interview report, Unum's OSP, Dr. Lyons, again reviewed Mr. Dolan's file. Dr. Lyon's found: "The insured's LOC [loss of consciousness] is consistently documented, is not well controlled." Dr. Lyon further found: "R&Ls [restrictions and limitations] supported; <u>duration is unclear but is likely to be long term</u>." (emphasis added).

37.     The day after Dr. Lyon's findings, Unum conducted covert surveillance of Mr. Dolan hoping to trail him to a previously-scheduled appointment with his attending neurologist, Dr. Moeen Din. The investigator noted that "Using investigative techniques" she determined that Mr. Dolan did not have an appointment that day, but did have an appointment scheduled for May 22, 2013. The investigator did not elucidate what "investigative techniques" she used to elicit this confidential patient information from Dr. Din's office.

38.     Unum was previously found liable for tortiously investigating an insured, including through improper investigative means that were used to obtain information. *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 984 (9th Cir. 2001).

39.     Prior testimony of Unum's now-CFO, John F. "Jack" McGarry establishes that Unum does not inform claims personnel of adverse jury or court verdicts or decisions.

40.     On May 22, 2013, Unum conducted further covert surveillance of Mr. Dolan. However, Mr. Dolan was not observed by the investigator that

attempted to trail him to his appointment. Again, "Using investigative techniques," the investigator elicited information from Dr. Din's office stating that Mr. Dolan had changed his appointment to earlier that morning. And again, the investigator did not elucidate what "investigative techniques" she used to elicit this confidential patient information from Dr. Din's office.

41.     In 2013, Genex asked Mr. Dolan's attending neurologist, Dr. Din, to complete a medical source statement relating to Mr. Dolan's disability. Dr. Din completed that form, noted that Mr. Dolan's diagnosis was reflex epilepsy, and noted that Mr. Dolan had limited visual abilities due to his reflex epilepsy. Dr. Din also noted that Mr. Dolan would need to take unscheduled breaks of 5-10 minutes every 15 minutes to avoid syncope or seizures; and that Mr. Dolan's seizure medications caused side effects that would interfere with his ability to function in the workplace. Finally, Dr. Din noted that Mr. Dolan's reflex epilepsy prevented him from "reading for long periods of time."

42.     In 2014, Unum noted that Mr. Dolan had received a speeding ticket, indicating he had been driving. Unum analyzed whether this information contradicted his diagnosis but found it "does not necessarily indicate[] insured was above his R&Ls."

43.     After obtaining additional medical evidence, including updated Attending Physician's Statements (APS's), Unum's OSP Dr. Lyon again reviewed Mr. Dolan's claim. Dr. Lyon found: "The insured's seizures are consistently reported, consistent in nature and supported as likely being due to reflex epilepsy by both Drs. Din and Torres. This updated information documents that the insured's clinical status is unchanged from last year." Dr. Lyon therefore found "R&Ls remain supported, duration is long term since the insured has had these episodes his whole life and they continue to occur less than every three months."

44.     Unum then reviewed whether Mr. Dolan's claim should continue to be considered a self-reported condition subject to the Plan's 24-month benefit limitation. Unum concluded, however, "the evidence could be considered physical findings as an observation. Therefore, Director has instructed DBS [disability benefit specialist, i.e. the adjuster] to remove claim for self report limitation."

45.     Unum thereafter removed the self-reported condition limitation and referred Mr. Dolan's claim to its unit responsible for handling claims for which no recovery was expected, which was then known as its "EBC," because Mr. Dolan's "condition is not likely to improve."

46.     Because Mr. Dolan remained disabled, and because his condition prevented him from performing any gainful occupation for which he was reasonably qualified, Unum informed Mr. Dolan on August 14, 2014 that "we are approving continued benefits into the any gainful occupation period."

47.     In a decision dated March 19, 2015, an Administrative Law Judge heard Mr. Dolan's SSDI appeal and issued a "Fully Favorable" decision. Among other things, the ALJ found that:

  a. "Reflex epilepsy is a condition in which seizures can be provoked habitually by an external stimulus or less commonly, internal mental processes. Individuals with reflex epilepsy may have seizures exclusively in response to specific stimuli and not suffer spontaneous seizures; alternatively, reflex seizures may coexist with spontaneously occurring seizures."

  b. "In addition to the medical evidence, the undersigned has considered the credibility of the claimant's allegations in light of the record presented."

  c. "The claimant's credibility is bolstered by his impressive work

history and attempts to keep working despite physical impairments that were progressively worsening."

d. "Additionally, the claimant's credibility is buoyed by his genuine attempts to return to work despite disabling seizures and hearing loss."

e. "The vocational expert testified that given all of these factors there are no jobs in the national economy that the individual could perform."

f. "Based on the testimony of the vocational expert, the undersigned concludes that the claimant is unable to make a successful vocational adjustment to work that exists in significant numbers in the national economy. A finding of 'disabled' is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines."

g. "the claimant has been disabled under sections 216(i) an d223(d) of the Social Security Act since March 5, 2012."

h. "Medical improvement is expected with appropriate treatment. Consequently, a continuing disability review is recommended in 24 months."

48.     On March 24, 2015, Genex, which Unum had hired to assist Mr. Dolan with his SSDI claim, forwarded a copy of the ALJ's Fully Favorable SSDI decision to Unum.

49.     On April 6, 2015, Genex forwarded Mr. Dolan's SSDI "Notice of Award" to Unum.

50.     Because the retroactive payment of Mr. Dolan's SSDI benefits created an overpayment of his LTD benefits, Unum sent Mr. Dolan a letter on April 7, 2015 demanding that he repay $77,033.50 in overpaid LTD benefits.

51.     Mr. Dolan promptly reimbursed Unum for the overpayment and, on

June 24, 2015, Unum sent him a letter confirming he had reimbursed the overpayment in full.

52.     In 2006, Mr. Dolan had created an environmental-focused company with a partner and disclosed it to Unum in 2012. The company was called Virtual Technologies.

53.     In August 2015, Unum asserted that Mr. Dolan's claim had been overpaid by roughly $19,000 because it determined that Virtual Technologies had shown a profit. Mr. Dolan responded that the alleged profit was money he had put into the company and that the company's only contracts preceded his disability and were closed out in the 2013-2014 tax year. Mr. Dolan also informed Unum that he did not receive any funds from Virtual Technologies.

54.     Unum then requested tax returns from Virtual Technologies and from Mr. Dolan personally, which he provided. After reviewing the provided information, Unum determined that Virtual Technologies was in fact winding down and had not shown a profit, and that no overpayment requiring reimbursement had therefore occurred.

55.     In August 2015, Unum requested updated information about Mr. Dolan's claim, including requesting an Attending Physician's Statement from Dr. Din. Dr. Din completed the APS Unum requested, noting his findings that Mr. Dolan had "reflex epilepsy, which is primary reading epilepsy well documented in literature. Not well controlled." Dr. Din also noted his findings that Mr. Dolan's reflex epilepsy prevented him from reading and that the duration of his restrictions due to the condition was "lifetime."

56.     Despite Dr. Din's unambiguous APS findings, Unum recommended that his claim be pulled from its extended duration unit, which it had renamed the "SBU" or Special Benefits Unit, and return it to an adjuster.

57.     Unum then conduced a "roundtable" of Mr. Dolan's claim. Unum

has been repeatedly criticized for using "roundtables" to find ways to close claims, and for not sufficiently documenting the substance of the "roundtable" discussions.

58.     As with other Unum acronyms, Unum periodically changes the name of roundtables. After receiving criticism for its bad faith roundtable practices, Unum changed the name to team-based approach, or "TBA-roundtables," then "TBAs," and then "Forums." Upon information and belief, Unum periodically changes the names of such things as part of an effort to evade judicial scrutiny of its actions.

59.     At the September 2016 roundtable of Mr. Dolan's claim, Unum decided to conduct further covert surveillance of Mr. Dolan (which it now called an "activities check") and then "return to forum," i.e. return to roundtable.

60.     After realizing Mr. Dolan "lives in a very rural area" and that covert surveillance would likely be ineffective, Unum decided against running surveillance at that time. Unum decided, however, to consider "sitting at Drs office during NOV [next office visit] and seeing if insured is driver or passenger, see if he is accompanied by anyone else, check for assistive devices etc." Unum has previously determined, however, that Mr. Dolan's driving was not inconsistent with his disability. Unum also knew that Mr. Dolan's disability, reflex epilepsy triggered by reading, did not require assistive devices.

61.     In October 2016, Unum conducted a telephone interview with Mr. Dolan. Among other things, the interviewer found Mr. Dolan "was forthcoming and [k]new full details of situations from before DOD [date of disability]." Mr. Dolan also stated that Virtual Technologies was in the slow process of going out of business, that he did very little actual work with the company, and that he disagreed with the overpayment Unum asserted but that he was unable to read the long overpayment document. The interviewer informed him he could appeal

the overpayment decision.

62.     A few days later, Unum sent a letter to Dr. Din asking about Mr. Dolan's ability to perform physical work tasks, such as lifting, sitting, standing, and walking. Because Mr. Dolan's disability is not based on such tasks, Dr. Din stated that Mr. Dolan was able to perform those tasks on a full-time basis. Notably, Unum did not ask Dr. Din if Mr. Dolan's reading-based R&Ls had changed.

63.     A couple weeks later, Dr. Din responded to another Unum letter which asked about Mr. Dolan's R&Ls. He wrote "He is unable to read continuously due to it could cause him to go into an episodic seizure. Patient should not continuously read."

64.     In November 2016, Unum conducted another roundtable of Mr. Dolan's claim. Though Dr. Lyon remained a Unum OSP, and though he had previously reviewed Mr. Dolan's claim and medical evidence multiple times and determined that Mr. Dolan was permanently disabled due to his reflex epilepsy, Unum excluded him from the roundtable.

65.     Two days later, Unum's DBS told Mr. Dolan over the phone that "Dr. Din had released [Mr. Dolan] to RTW [return to work]." This was false. Dr. Din had never released Mr. Dolan to return to work.

66.     That same day, the same DBS wrote to Dr. Din asking him to state Mr. Dolan's restrictions for tasks like keyboard use, talking, hearing, and travel. This further contradicted the DBS's statement that Dr. Din had released Mr. Dolan to return to work.

67.     A week later, Dr. Din responded to that letter stating Mr. Dolan was not able to perform his occupational demands on a full-time basis because "reading and concentration cause dizziness, double vision and seizures." Dr. Din also provided Unum with office visit notes reiterating Mr. Dolan's medical

history and diagnosis. One of those notes stated: "I believe he has reflex epilepsy, which is primary reading epilepsy well documented in literature. Not well controlled. Side effects of Keppra with personality change."

68.     The next day, Unum conducted *another* roundtable  of Mr. Dolan's claim. Unum's vocational specialist confirmed that in Mr. Dolan's occupation "reading would be required on a frequent basis." Unum's claims director, who was running the roundtable, noted however that "functional capacity appears unclear" because Mr. Dolan's reported seizures appeared to be less frequent. The claims director ignored, however, that Mr. Dolan's reflex epilepsy was permanent and that the decrease in seizure frequency was due to his knowledge of his triggers and avoiding those triggers, as his medical records show.

69.     After conducting more investigation, including pulling Mr. Dolan's driving record and noting several moving violations, Unum conducted yet another roundtable of his claim in January 2017. Again, though Dr. Lyon had previously reviewed Mr. Dolan's claim and determined that his restrictions were well-supported and permanent, Unum excluded him from the roundtable. At the roundtable, Unum determined to contact Dr. Din for additional information.

70.     For the fifth time in three months, Unum again wrote to Dr. Din requesting information; this time asking Dr. Din to agree with Unum's new OSP's opinion that "there is no medical support for an inability to perform" full-time work, including reading in 20-30 minute blocks throughout the day. Dr. Din did not respond to Unum, again signaling his refusal to agree to Unum's attempts to influence his findings.

71.     Unum's new OSP then issued a report saying Mr. Dolan was able to work full-time in reading-intensive occupations as long as he could "pace his reading with frequent momentary breaks as needed." This opinion contradicted and conflicted with the other substantial medical evidence in the file.

14

72.     Unum then sent Mr. Dolan's file to its "Designated Medical Officer," or DMO, for review. The DMO's job is to act as a "tiebreaker" on claims in which the OSP gives an opinion that conflicts with the attending physician's findings. The DMO is therefore charged with determining whether the OSP's opinions are more supported than the attending physician's findings.

73.     Evidence produced in other cases showed that the DMO in that case agreed 100% of the time with the OSP's rejection of the attending physicians' findings. Thus, the evidence shows that the DMO always "breaks the tie" in favor of Unum and contrary to the attending physicians.

74.     The DMO on Mr. Dolan's claim was Alan Neuren. As expected, Dr. Neuren's opinion was "Concur with OSP."

75.     Unum then sent Mr. Dolan's file to its Quality Compliance Consultant, or QCC. The QCC's job is to act as a "watchdog" to ensure claim decisions comply with Unum's claims-handling obligations, including those imposed under its Regulatory Settlement Agreement. Testimony in another case establishes, however, that Unum's QCC's have been embedded in Unum's claims departments, that their compensation depends on the company's financial performance and the performance of their units as compared to other units within Unum, and that the QCCs act as "lapdogs" rather than "watchdogs" guarding the insureds' rights.

76.     The QCC in Mr. Dolan's case signed-off on the termination of Mr. Dolan's benefits despite that decision violating multiple Unum claims-handling requirements, such as its obligation under its Regulatory Settlement Agreement to give substantial weight to the findings of attending physicians and to give substantial weight to an award of SSDI benefits.

77.     On February 1, 2017, Unum terminated Mr. Dolan's benefits.

78.     All the justifications Unum used for terminating Mr. Dolan's

benefits are incorrect or contrary to the company's previous findings of well-supported, permanent disability.

79.   The justifications Unum used for terminating Mr. Dolan's benefits show Unum's decision was based on biased, outcome-focused reviews that conflicted with Unum's previous findings, including the findings of Unum's OSP Dr. Lyon, whom Unum excluded from its outcome-focused 2016 and 2017 review process.

80.   At the time Unum terminated Mr. Dolan's benefits, it had been paying LTD benefits for nearly five years, after finding he initially became disabled in March 2012 and therefore became eligible for LTD benefits in September 2012.

81.   At the time Unum terminated Mr. Dolan's benefits, his condition had not changed or improved. Indeed, Unum had previously and repeatedly determined that his disability was permanent.

### MR. DOLAN APPEALS UNUM'S BENEFITS TERMINATION, UNUM DOUBLES DOWN ON ITS CLAIMS-VIOLATING CONDUCT, AND DENIES HIS APPEAL

82.   On July 24, 2017, Mr. Dolan timely appealed Unum's decision terminating his LTD benefits.

83.   In his appeal letter, Mr. Dolan noted the multiple claims-handling violations that Unum had committed in the course of terminating his benefits, including its repeatedly violating its obligations under the Regulatory Settlement Agreement it had entered into with insurance regulators from 49 states, including Arizona.

84.   Mr. Dolan also submitted extensive evidence confirming his disability, including but not limited to:

  a. Multiple sworn declarations from people who had witnessed Mr. Dolan's seizures;

b. Multiple peer-reviewed journal articles showing the fallacy of Unum's citing the absence of certain evidence as justification for its termination decision;

c. The Arizona Administrative Code sections disproving Unum's theory that Mr. Dolan's driving sometimes contradicted his claim;

d. Additional medical records and a letter from Mr. Dolan's attending neurologist re-certifying his disability and diagnosis;

e. Additional information from the Social Security Administration recertifying his disability under the far more stringent SSDI standard for disability;

f. Information from Unum's RSA showing Unum violated its own, agreed-upon claims-handling standards in terminating Mr. Dolan's benefits;

g. Information from Unum executives showing Unum's termination of Mr. Dolan's benefits violated its own internal standards;

h. Mr. Dolan's signed agreement to undergo a risky, induced-seizure EEG if Unum would agree to indemnify him if he suffered any harms as a result of the induced-seizures, including SUDEP or Sudden Unexpected Death in Epilepsy, a not infrequent complication of seizures; and

i. An assessment by a vocational professional finding Mr. Dolan's reading restrictions preclude him from working in any gainful occupation as defined by the LTD plan.

85. Rather than conducing the full and fair review ERISA requires, and rather than complying with its obligations under the RSA, Unum doubled-down on its outcome-focused claims processes in order to affirm the termination of Mr. Dolan's expensive LTD claim.

86.     Among other thing, Unum's appeal personnel scoured Mr. Dolan's claim file, which by then exceeded 3,100 pages, to identify alleged "inconsistencies" in his claim; including alleged inconsistencies in Mr. Dolan's symptom reports back to 2012, 2013, and 2014. This is further evidence of Unum's outcome-focused reviews because it contradicts the findings of OSP Dr. Lyon who reviewed the same evidence and found Mr. Dolan "consistently reported" symptoms and those symptoms were "consistently documented," and that therefore Unum found "R&Ls supported," that the "duration is unclear but is likely to be long term," and that Unum ultimately found his disability was permanent and referred Mr. Dolan's claim to its extended duration unit.

87.     Unum's decision denying Mr. Dolan's appeal was caused and driven by the same financial conflicts of interest that caused and drove the February 1, 2017 termination of Mr. Dolan's benefits after paying his claim for nearly five years.

**UNUM'S BIASED CLAIMS-HANDLING:**
**CLAIMS DIRECTORS ARE INSTRUCTED ON THE COMPANY'S "PLAN" FOR CLAIM "RECOVERIES" (I.E. CLAIM CLOSURES) AND ITS "PLAN" TO LIMIT CLAIM "REOPENS" (I.E. BENEFIT REINSTATEMENTS)**

88.     Previously, Unum and its subsidiary companies, including Provident Life and Accident Insurance Company and Paul Revere, sold individual disability insurance and long-term care policies. These "Closed Block" policies, as Unum calls them, have proved to be terribly unprofitable and have caused Unum great financial distress as the Closed Block insureds have gotten older, more disabled, and yet are living longer. As a result, Unum has had to repeatedly increase reserves on its Closed Block policies, to the financial detriment of the company.[1]

---

[1] https://investors.unum.com/Cache/1500083638.PDF?O=PDF&T=&Y=&D=&FID=1500083638&iid=103324 at report p. 19 n. 2 (Unum 2015 Annual Report noting

18

89.     To deal with its Closed Block financial problem, Unum's executives instituted a top-down claims management philosophy to deal with that problem, which includes using "claims management capabilities to mitigate reserve pressure." (*See* Exhibit 1 at 907 (highlighting added)).[2]

90.     The reasons for this approach are the "mounting pressures on reserve margins increasing the urgency of these efforts." (Ex. 1 at 912 (highlighting added)).

91.     "Claims management" should never be used to "mitigate reserve pressure." Disability claims are either valid and should be paid or they are non-compensable and should not be paid.

92.     To lock employees into this outcome-oriented system, Unum uses "Scorecard" and "Weekly Tracking" metrics to evaluate employee performance and determine their compensation. (*See* Exhibits 2 and 3).

93.     Scorecards are color-coded, with green meaning the metric is "At or Above Plan," yellow meaning it is "Near Plan / Trend Alert," and red meaning it is "Below Plan." (*Id*.). As Unum's CFO, Jack McGarry testified in a previous case, under this "stoplight measure," red is "stop… or bad." (Ex. 2; *see also* Exhibit 4, Depo. of Jack McGarry at 184:4-16; *compare* Exhibit 5 at 1449 (Human Capital Committee "PBI [Performance Based Incentive compensation] Service Measure Proposal" presentation noting "Traffic lighting (green, amber, red) will also be used and ranges to determine color will be standardized across business entity.").

---

reserve increases of nearly $1.5 billion on Closed Block policies over the previous few years).

[2] All exhibit page number references are to the "912 of 1677" bates numbered pages at the bottom right of each document. The page references to Exhibit 4, the deposition of Jack McGarry, refers to the deposition transcript page number.

94.     Among the Scorecard metrics given to its claim directors is Unum's "Expectation" for the claim "Reopen Rate"; meaning the rate at which previously-closed claims are put back into paid status, such as through a successful appeal.

95.     A previously-produced Scorecard shows that director's unit was red-flagged for having a "Below Plan" Reopen Rate in April 2013 of 22%, and a "Below Plan" Reopen Rate of 17% the first week of June. (Ex. 2 at 40 (arrows added)). In other words, that director's team was reinstating too many claims.

96.     Unum's Weekly Tracking documents tell claim directors the number of "Actual" claim Recoveries their units achieved and compare that to Unum's "Plan" for claim Recoveries. (Ex. 3). The Weekly Tracking documents also tell claim directors of Unum's "Actual" number and percent of claim Reopens and how those metrics compare to the Unum's "Plan" for claim Reopens. (Ex. 3).

97.     Unum's Weekly Tracking documents also tell claim directors the "Actual" Liability Acceptance Rate (LAR), or the overall percentage of claims their units are approving, and compares that to Unum's "Plan" LAR.

98.     While Unum often argues its Scorecards and Weekly Tracking documents are projections based on historical trends and not claim targets, this does not appear to be true. If this were true, for example, Unum should red-flag directors when too few claims are paid, such as when their reopen rate is too low. Unum does not do this, however. Instead, it only red-flags directors when their metrics are too unprofitable. (Ex. 2 at 40 (red-flagging 22% and 17% reopen rates but not 0% reopen rates even though that is a larger deviation from Unum's "Expectation" Reopen Rate of 10% or less ("No red flag when reopen rate is 0%" text added)).

99.     Previously-produced personnel evaluations show Unum rates employees based on Scorecard metrics and that employees focus on and boast

about positive metrics. Indeed, after one director boasted that "these metrics represent my abilities to manage my portfolio" her supervisor applauded her Scorecard-driven focus: "While there may be an occasional 'blip' in regard to a metric, [employee] is also quick to respond to assure the measurement returns to expected levels."

100.   Previously-produced documents show Unum "ties together the scorecard with individual's performance" for purposes of its "Performance Based Incentive" or PBI bonus program.

101.   Then, Unum's bonus documents tell employees they are competing against one another for valuable bonus dollars.

102.   For example, Unum's Frequently Asked Questions materials explaining its Performance Based Incentive (PBI) program tells employees: "Since the goal of the PBI plan is to effectively align our employees with company business objectives, it is critical everyone that everyone clearly understands how his or her role contributes to the performance of the business and, ultimately, the entire corporation. When an employee's performance is a factor in the overall success of the organization, he or she should share in that success." (*See* Exhibit 6 at 1253)

103.   The PBI FAQs further tells employees that "[a] payout under the PBI occurs when, and if, we successfully achieve our goals…" (*Id.*)

104.   The PBI FAQs further tell employees that their performance and bonuses will be rated against other employees, and that therefore they are in a competition with other employees for valuable PBI dollars: "Dollars are allocated based on the financial results of the business area taking into consideration key financial and non-financial goals. The results are measured by assessing the contribution of each Business Area, in relation to each other, based on their achievements, in relation to the overall goals, the Balanced Business Scorecard,

and other business considerations." (*Id.* at 1254).

105.   Unum's in-house physicians, such as OSP Dr. Lyon, and the OSP and DMOs whose reviews Unum used to justify terminating Mr. Dolan's benefits, are eligible for bonuses of up to 20%, or more, of their salary.

106.   Unum's in-house physicians' financial interests are further linked the company's financial performance because they are eligible for company stock under Unum's Long-Term Incentive (LTI) compensation program.

107.   Unum's claim directors, who receive and review the Weekly Tracking and Scorecard documents showing Unum's "Plan" for claim Recoveries and Reopen Rates, are eligible for bonuses of up to 15% of their salary.

108.   Unum puts its stock price on the home page of employees' computers to remind them of the importance of supporting the company's financial performance.

109.   Unsurprisingly given Unum's efforts to remind employees of the importance of assisting Unum's profitability, and Unum's overt tying of employee compensation to the company's profitability, Unum's physicians are known to provide company-favoring medical reviews. For example, though Unum's DMOs (Designated Medical Officers) are supposed to be the "tiebreakers" who must decide whether the attending physicians' findings are more well-supported, or the opinions of Unum's bonus-eligible OSPs, prior DMO reports Unum was ordered to produce in another (*Knuth*) case showed the DMO agreed with the OSP 100% of the time. In other words, in each case, the DMO broke the "tie" in favor of Unum and against the insured or his attending physicians.

110.   In short, Unum has deliberately created and fostered a culture of self-serving claims conduct and bias through its business practices and bonus structures.

111.   This financially-incentivized culture of self-serving claims conduct and bias drove Unum's decision to repudiate OSP Dr. Lyon's previous findings that Mr. Dolan was disabled and Unum's conclusion that his disability was permanent.

### UNUM CREATES AN "OPERATIONS" DEPARTMENT OR UNIT CHARGED WITH REVIEWING PERMANENT DISABILITY CLAIMS AND FINDING WAYS TO CLOSE THEM, AND ITS OPERATIONS UNIT GINS UP REASONS TO CLOSE MR. DOLAN'S CLAIM

112.   When Unum determines that an insured's disability is permanent and not likely to improve, it sends the claim to its Special Benefits Unit or "SBU".

113.   Unum previously called the Special Benefits Unit the "EDU," or "Extended Duration Unit," or the Extended Benefit [unknown] or "EBC."

114.   The SBU (f/k/a EDU) is a unit within Unum that manages claims for insureds for whom Unum expects no improvement.

115.   Claims management within the SBU is generally minimal. Financially, it does not make sense for Unum to expend staff time and other expenses reviewing claims for which no improvement is expected.

116.   Over the past several years, and as Unum has experienced increasing financial strain due to its unprofitable Closed Block policies, Unum has searched for ways to prop up its bottom line through "high quality claims management to reduce reserve pressure."

117.   Upon information and belief, created an "Operations" unit or department.

118.   Upon information and belief, Unum's "Operations" unit or department is charged with reviewing claims within the SBU (f/k/a EDU) to find claims that Unum may be able to close.

119.   Upon information and belief, the "Operations" personnel have been specifically instructed to search through claims for alleged "inconsistencies" that

23

may be used to justify terminating claims Unum previously found were permanent and/or not likely to improve.

120.   Although Unum OSP Dr. Lyon had repeatedly determined that Mr. Dolan condition was legitimate, disabling, and that improvement was unlikely, Unum assigned "operations physician" Sabrina Hammond to review Mr. Dolan's claim.

121.   Upon information and belief, Dr. Hammond, like all Unum employees and OSPs, is eligible for bonuses under Unum's PBI program, is informed and knows that her bonuses depend upon her contribution to Unum's overall financial performance, is eligible and may have already been awarded company stock under Unum's LTI program, and is eligible for PBI bonuses of up to 20% or more of her salary.

122.   Operations OSP Dr. Hammond participated in the pre-termination "roundtables" of Mr. Dolan's claim.

123.   Upon information and belief, the purpose of the "roundtables" of Mr. Dolan's claim was to find ways to justify terminating his expensive LTD claim.

124.   Consistent with her role as Operations OSP, Dr. Hammond dutifully scoured Mr. Dolan's claim file to find ways to justify terminating his benefits.

125.   Unum then referred Mr. Dolan's claim to its "tiebreaker" DMO who dutifully agreed with Operations OSP, Dr. Hammond.

126.   Upon information and belief, discovery will show that Unum's DMO agrees with Unum's OSP, and not with the insureds' attending physicians, 100% of the time, or nearly 100% of the time.

127.   Mr. Dolan's claim file reflects that the following "Operational Reviewers [were] Associated with Adverse Decision: M. Sones, RN; K. O'Reilly, RN; C. Long, RN; S. Hammond, MD; A. Neuren, MD (DMO)."

128.   Upon information and belief, Unum's termination of Mr. Dolan's benefits was caused and driven by the financial conflicts of interest the company deliberately created and fosters among its employees.

129.   Upon information and belief, Unum's termination of Mr. Dolan's benefits was caused and driven by the directives provided to its "Operations" personnel to review claims Unum recognizes to involve permanent disabilities and find ways to justify closing such claims, including by focusing on alleged "inconsistencies" in multi-thousand page claim files in order to tacitly accuse insureds of committing fraud and tacitly accuse their attending physicians either of colluding with their patients to commit insurance fraud or tacitly accuse their attending physicians of incompetence by among other things apparently misdiagnosing their patients or failing to spot their patients' fraud which, according to Unum's bonus-eligible physicians' medical records reviews, should be patently obvious.

#### UNUM'S TERMINATION OF MR. DOLAN'S BENEFITS VIOLATES THE RSA

130.   Unum terminated Mr. Dolan's benefits in violation of its obligations under the RSA.

131.   First, Unum failed to give significant weight to the opinions of Mr. Dolan's attending neurologist, Dr. Din.

132.   Under the RSA, Unum may only reject Dr. Din's findings if they are "not well supported by medically acceptable clinical or diagnostic standards and [are] inconsistent with other substantial evidence in the record."

133.   To reject Dr. Din's findings, Unum was also required to "include specific reasons why the opinion is not well supported."

134.   Under the RSA, Unum may only reject a disability claim when the insured has been awarded SSDI benefits if the SSDI award was "(i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable

medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy."

135.   Unum's obligations under the RSA still apply to its claims handling.

136.   To meet the RSA standards, the information Unum relies upon to distinguish an SSDI award must be "compelling" and not "just some information."

137.   To meet the RSA standards, the information Unum relies upon to repudiate an attending physician's findings must likewise be "compelling" and not "just some information."

138.   In terminating Mr. Dolan's claim, Unum violated its obligations under the RSA.

139.   Specifically, Unum did not meet the standard to distinguish Mr. Dolan's fully favorable SSDI award.

140.   Additionally, Unum did not meet the standard to repudiate Dr. Din's clinical findings and opinions.

141.   Additionally, the bulk of the information Unum later relied upon to justify its decision terminating Mr. Dolan's benefits was known to the company for years. Indeed, OSP Dr. Lyon, who determined that Mr. Dolan's was disabled due to reflex epilepsy and that his restrictions were long-term, reviewed much of the same information Unum later cited to justify its outcome-focused decision to terminate Mr. Dolan's benefits.

### COUNT ONE: CLAIM FOR BENEFITS UNDER ERISA, 29 U.S.C. § 1132(A)(1)

142.   Mr. Dolan incorporates the preceding allegations as if fully set forth herein.

143.   Mr. Dolan was and remains totally disabled as defined under the LTD Plan.

144.   Mr. Dolan has been damaged by Unum's improper decision

26

terminating his LTD claim.

145.   Unum abused its discretion because its decision terminating Mr. Dolan's benefits was arbitrary and capricious, unreasonable, not well founded, and because it was caused or influenced by Unum's, its employees', and the Plan's financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

146.   Unum has a biased and parsimonious claims handling history.  *See e.g. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) (finding Unum and the LTD plan in that case "violated its procedural obligations and violated its substantive obligation by abusing its discretion and judging the disability claim arbitrarily and capriciously. Our skepticism of its approach is heightened because of its conflict of interests.").

147.   Unum has a long history of improper claim administration.  *Id.*

148.   Upon information and belief, Unum and its employees deliberately target high-dollar claims like Mr. Dolan's for closure.

149.   Upon information and belief, and as testified to by former AVP Paul Peter, every month Unum's VP of claims, Maureen Griffin, would give him claim "recovery expectations," representing both the number of claims his team was expected to close that month and a dollar value of reserves his team was expected to recover.

150.   Upon information and belief, Ms. Griffin and her subordinates deliberately avoided creating a paper-trail regarding this improper focus on achieving a predetermined number of claim closures by systematically avoiding the creation of an electronic record of such information and systematically destroying any hand-written notes at the end of each month.

151.   Contrary to the Supreme Court's observation in *MetLife v. Glenn* that

27

an insurer's financial conflict of interest should be less important when the evidence shows the insurer took steps to wall-off the claims personnel from those interested in firm finances, Unum has deliberately taken the opposite approach and walled-in claims personnel into interest in firm finances.

152.   Unum violated the terms of the Regulatory Settlement Agreement in administering and terminating Mr. Dolan's claim.

153.   Unum violated industry standard and generally accepted claims-handling principles in administering and terminating Mr. Dolan's claim.

154.   Mr. Dolan is entitled to discovery and to introduce evidence showing the effects of Unum's and its employees' financial conflicts of interest and biases on the decision terminating Mr. Dolan's claim, and on the procedural irregularities that infected the claim process.

155.   Pursuant to ERISA, Mr. Dolan is also entitled to discovery regarding, among other things, the biases and credibility of the personnel Unum relied upon to terminate his LTD benefits. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901–02 (9th Cir. 2016); *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007); *Watson v. Metro. Life Ins. Co.*, No. CV-11-01393-PHX-GMS, 2012 WL 5464986, at *9 (D. Ariz. Nov. 8, 2012) ("This proceeding is a trial on the administrative record, and Watson's allegations go to the weight that the Court should assign the evidence and conclusions of the MetLife consultants. If all of these issues would be relevant in an abuse of discretion case, they are just as relevant in a de novo case.").

156.   Pursuant to ERISA, Mr. Dolan is entitled to take discovery, introduce evidence, and have a bench trial regarding, among other things, the biases and credibility of the medical and vocational personnel Unum relied upon to terminate Mr. Dolan's LTD benefits and the effect of their and Unum's inherent financial conflicts of interest on the decision terminating Mr. Dolan's

claim. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901–02 (9th Cir. 2016); *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007); *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) ("Instead, without evidentiary hearing or bench trial, the district court considered and rejected Nolan's bias argument by weighing the documentary evidence of bias, and ignoring the protections that summary judgment usually affords the non-moving party. Though the district court would have been permitted to weigh such evidence after bench trial, weighing that evidence on summary judgment was improper in this case where the evidence was outside of the administrative record."); *Watson v. Metro. Life Ins. Co.*, No. CV-11-01393-PHX-GMS, 2012 WL 5464986, at *9 (D. Ariz. Nov. 8, 2012) ("This proceeding is a trial on the administrative record, and Watson's allegations go to the weight that the Court should assign the evidence and conclusions of the MetLife consultants. If all of these issues would be relevant in an abuse of discretion case, they are just as relevant in a de novo case."); *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) ("Evidence is essential if the court is to fulfill its fact-finding function. Just so in ERISA litigation. When review is deferential—when the plan's decision must be sustained unless arbitrary and capricious—*then* review is limited to the administrative record… Otherwise, however, the court decides on the record made in the litigation. And, if material evidence conflicts, then there must be a trial.").

157. The effects of Unum's and its employees' financial conflicts of interest are evident in multiple aspects of the handling of Mr. Dolan's claim, including but not limited to:

         a. Unum's deliberately creating a financial conflict of interest among its employees, including those involved in Mr. Dolan's claim, by tying their financial compensation in part to the

company's overall financial performance and thereby giving them a financial interest in the outcome of Mr. Dolan's claim;

b. Unum's exclusive reliance on in-house, bonus-eligible employee physicians to review Mr. Dolan's medical records to justify terminating his benefits and denying his appeal;

c. Unum's establishing an "Operations" unit or department whose purpose is to examine claims Unum has determined to be justified and permanent and to find justifications for closing those claims;

d. Unum's multiple violations of its obligations under the RSA in terminating Mr. Dolan's benefits and denying his appeal;

e. Unum's deliberately repudiating OSP Dr. Lyon's previous findings of Mr. Dolan's disability and deliberately excluding him from subsequent "roundtables" of Mr. Dolan's claim;

f. Unum's "roundtabling" Mr. Dolan's claim with its "Operations" personnel to find ways to justify closing his claim, and then failing to adequately document the substance of those "roundtable" discussions;

g. Unum's reliance upon the opinions of a DMO "tiebreaker" whom Mr. Dolan alleges upon information and belief breaks the "tie" in favor of Unum by agreeing with the OSP findings 100% of the time, or close to 100%;

h. Unum's deliberately creating and fostering an institution-wide financial conflict, including among its claims employees, through its use of Scorecards, Weekly Tracking documents, and then expressly tying employee compensation to the company's overall financial performance;

30

i.  Unum's and its employees' deliberately engaging in and ignoring multiple other procedural irregularities and improper conduct throughout the course of Mr. Dolan's claim in order to close his expensive claim;

j.  Unum's and its employees' deliberately targeting expensive claims like Mr. Dolan's for closure;

k.  Unum's and its employees' deliberately misconstruing or misinterpreting medical evidence justify terminating Mr. Dolan's expensive LTD claim;

l.  Unum's scouring his 3,100+ page claim file to identify alleged "inconsistencies" that Unum was previously aware of and which OSP Dr. Lyon reviewed and found were not inconsistent at all.

158.   Mr. Dolan has been injured and suffered damages in the form of lost LTD benefits as a result of Unum's wrongful decision terminating his disability benefits.

159.   Mr. Dolan has been further injured and suffered damages by losing other benefits to which he may have been entitled under his employer's ERISA-governed benefits plan.

160.   Upon information and belief, Unum's return on equity for the period ending December 31, 2018 was 12.69%.

161.   Pursuant to ERISA, 29 U.S.C. § 1132(a)(1) and/or 29 U.S.C. § 1132(a)(3), Mr. Dolan is entitled to recover unpaid disability benefits, reinstatement of his LTD benefits, a declaration that he is entitled to ongoing disability benefits, prejudgment interest at the maximum allowable rate but at a rate no lower than the rate at which Unum earned interest and/or return on equity on Mr. Dolan's unpaid disability benefits, reasonable attorney's fees and costs, and/or is entitled to an order enforcing his right to disability benefits

under the LTD plan.

WHEREFORE, Plaintiff Shawn Dolan prays for judgment as follows:

A.    For long-term disability benefits due under the Plan and/or an order enforcing his right to LTD benefits under the Plan;

B.    For any other ERISA plan benefits to which Mr. Dolan may be entitled due to his disability;

C.    For prejudgment interest at the maximum legal interest rate until paid;

D.    For attorney's fees and costs incurred as a result of prosecuting this suit pursuant to 29 U.S.C. § 1132(g);

E.    For other equitable relief as may be allowed by law including under 29 U.S.C. § 1132(a)(3); and

F.    For such other relief as the Court deems just and proper.

Dated January 13, 2020.

LAW OFFICE OF PATRICK MAUSE, PLLC

*/s/ Patrick W. Mause*
Patrick W. Mause
290 North Meyer Ave.
Tucson, AZ 85701

*Attorneys for Plaintiff*